**CONTINENTAL AIRLINES, INC., and Continental Express, Inc., Plaintiffs,**

v.

**UNITED AIR LINES, INC., and Dulles Airport Airline Management Council, Defendants.**

No. CIV. A. 00–684–A.

United States District Court, E.D. Virginia, Alexandria Division.

Jan. 5, 2001.

Vanessa Y. Chandler, Vinson & Elkins, Washington, DC, for Plaintiffs.

Andrew Abbott Nicely, Robert Lawrence Bronston, Mayer, Brown & Platt, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Cross-motions for summary judgment in this private federal antitrust suit present the question whether an agreement by defendants United Air Lines, Inc. ("United"), and the Dulles Airport Airline Management Council ("AMC") to restrict the size of carry-on bags at Washington Dulles International Airport ("Dulles") is unreasonable under Section 1 of the Sherman Act, 15 U.S.C. § 1.

### I.[1]

The *dramatis personae* for this dispute include, among others, two airlines familiar to any airline traveler. Plaintiffs Continental Airlines, Inc., and its wholly owned subsidiary, Continental Express, Inc. (collectively, "Continental"), are well-known air carriers that transport passengers, baggage, and cargo domestically and internationally. Continental operates at many major airports across the country and internationally, including Dulles, where it currently uses only one of the 120 terminal gates there in service. Equally well-known is defendant United, which is the largest carrier at Dulles, where it currently uses 38 of the 120 gates. Not so well-known is defendant AMC, an unincorporated association of carriers serving Dulles. The Federal Aviation Administration ("FAA") requires air carriers at every airport to form such associations to consider and resolve airport operational, security, and facility issues that affect more than one carrier. The AMC currently has 29 members, including both Continental and United, Air Canada, Air Tran, All Nippon Airways, Atlantic Coast Airways, British Airways, BWIA, Delta Airlines, Korean Air, Lufthansa, Sabena, Spanair, Swissair, TACA, and TWA, among other air carriers. AMC meetings are held monthly at Dulles. Also in attendance at these meetings are representatives of the Metropolitan Washington Airports Authority ("MWAA"), a public body created by agreement between the District of Columbia and the Commonwealth of Virginia. MWAA serves as the airport landlord and oversees the facilities at both Dulles and Washington Reagan National Airport ("National").

At Dulles, like at many other major airports, passengers must pass through common security checkpoints in the main terminal before proceeding to a departure gate. Dulles has two such security checkpoints, the East checkpoint, through which most of United's passengers pass, and the West checkpoint, through which most of Continental's passengers pass. Both checkpoints lead to one common "sterile" area, where passengers board shuttles, or "mobile lounges," that take them to midfield concourses where the individual gates are located. On average, approximately 65,000 people pass daily through Dulles's two security checkpoints.

The instant dispute arose in March and April of this year, when, over Continental's objections, defendants agreed to restrict

---

1. The factual precis that follows draws from the extensive summary judgment record, which includes *inter alia* transcripts of deposition testimony, expert reports, affidavits, pleadings, and answers to interrogatories.

References to the Appendix to Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment hereafter are marked as "PX ___."

the size of carry-on baggage for all airlines. To implement this agreement, defendants installed carry-on baggage "templates" at both security checkpoints at Dulles. These templates are stainless steel or plastic molds that fit over the opening of an x-ray machine conveyor belt and are sized and shaped to permit only bags that are about ten inches high and fifteen inches wide to pass through the x-ray machine. Passengers whose bags are too large to pass through the template must check such bags—presumably at the main ticket counter—before proceeding through the security checkpoint en route to a departure gate. Because all passengers departing from Dulles must pass through one of the two security checkpoints to reach their departure gates, the installation of the templates effectively restricts the size of carry-on bags for the passengers of *all* carriers at Dulles, including Continental.

Given that the focus of this case is the defendants' agreement to restrict the size of carry-on bags at Dulles, it is important to understand the facts and circumstances that led to the agreement's adoption and implementation. These facts and circumstances, gleaned from the extensive summary judgment record, paint a picture that helps illuminate the antitrust analysis. The appropriate starting point in painting this picture is recognition of the fact that many airline passengers, particularly business travelers, prefer to avoid checking baggage and, instead, to carry their bags onto the aircraft. The reasons for this preference include (i) the time and inconvenience involved in checking baggage at ticket counters and retrieving baggage at airport baggage claim areas, (ii) the risk of loss, damage, or delay associated with checking baggage, and (iii) the convenience

of having access to carry-on bags during the flight. Naturally, therefore, many passengers prefer to fly on airlines that cater to the preference for carry-on baggage.[2] Airlines,[3] for their part, generally respond to this demand and compete with each other on the basis of carry-on baggage capacity and policy, in addition to price, schedule, and service. Indeed, the FAA recognizes that "[s]ome carriers have made carry-on baggage a selling point, thereby pressuring their competition to do the same," and encourages air carriers to formulate individual carry-on baggage policies and practices "to provide passengers ... the services they want while meeting the safety requirement for proper baggage stowage of all bags." Carry on Baggage Program, 52 Fed.Reg. 21,472, 21,472, 21,-474 (1987).

In the 1990s, a healthy economy, among other causes, contributed to a significant increase in air travel so that by the middle of the decade, many aircraft did not have sufficient under-seat or overhead bin storage space to stow securely the number and size of bags brought onboard by the increasing number of passengers. The competitive market compelled carriers, including Continental and United, to address this issue. In this regard, United, for example, experimented with a program called "Take–Off Fares" at Des Moines International Airport that conditioned the purchase of low-fare tickets on restrictions that included a limit of one carry-on bag per passenger. One of the program's goals was to determine whether carry-on storage space that otherwise would be provided to low-fare—or "low-yield"—passengers could feasibly be reallocated to high-yield passengers by imposing carry-on baggage restrictions on low-yield passen-

---

**2.** For example, it is undisputed that United considered the total amount of carry-on space an important—if not the most important—driver of customer repurchase intent on its West-coast United Shuttle service, and that one United study projected an annual rate of return of 43% to 61% from expanded onboard carry-on space.

**3.** The terms "airline," "carrier," and "air carrier" are used interchangeably to refer to providers of commercial air transportation of passengers, baggage, and cargo.

gers in exchange for discounted fares. In the end, United deemed the experiment a failure after its internal analysis concluded that any potential benefit to be derived from the reallocation of resources to high-yield passengers[4] fell far short of outweighing potentially significant low-yield market share loss attributable to passengers switching to competitor airlines that did not adopt similarly restrictive programs.[5] United decided, therefore, that "in the competitive environment in which we operate everyday, that was simply a policy that we could not maintain."[6]

Other airlines responded differently. Some explored the feasibility of installing carry-on baggage "templates" at airports to screen "oversized" bags. In 1997, for instance, Continental experimented with such a template at its hub at Houston's George Bush Intercontinental Airport. Analysis of the customer feedback showed that the template irritated customers. Continental therefore rejected templates as a solution to the increasing demand for greater carry-on baggage capacity and "passenger-friendly" carry-on baggage policies. Instead, Continental chose to increase aircraft carry-on storage capacity and to relax its carry-on baggage policy. Specifically, Continental chose to retrofit its entire fleet of 41 Boeing 757–200, 65 Boeing 737–300, and 66 Boeing 737–500

aircraft, in addition to 16 of its McDonnell Douglas MD–80 aircraft, with larger overhead bins at a cost of approximately $12.4 million. Continental also purchased new Boeing 737–700, 737–800, 767, and 777 aircraft with larger overhead bins. It then aggressively promoted this bin-expansion program in advertisements, billboards, press releases, and sales calls on customers. In addition, Continental adopted a flexible carry-on baggage policy that, in practice, had two components. First, Continental eschewed rigid and inflexible limitations on the size and number of bags its passengers were allowed to carry onto the aircraft; instead, it vested discretion on gate personnel to determine how many and what size bags passengers would be allowed to carry onboard given the "load factor," or percentage of seats filled, and other circumstances of a particular flight.[7] Thus, Continental passengers could carry onboard larger bags, and more of them, on flights with lower load factors. On flights with higher load factors, passengers were limited to two reasonably sized carry-on bags and therefore were asked to check other bags at the gate. To facilitate this gate-checking process, Continental installed (i) bag slides to deliver bags from the jetway to the ramp, and (ii) bag ticket printers at gates for gate-checking pur-

4. United anticipated this benefit to be increased high-yield market share, delay minute savings, and distribution cost savings.

5. The results suggested, however, that savings from decreased costs could be realized if competitors matched United's program, although no market share loss or high-yield share gain could be expected in that situation. In the end, United tentatively concluded that the program "offer[ed] limited cost savings potential with a risk of significant low-yield market share loss." PX 782, at UA9202.

6. PX 646, at 21.

7. It is undisputed, as defendants note, that Continental's published tariff and contract of carriage state that the size of carry-on bags is limited to a maximum of 45 linear inches— the approximate dimensions of the storage space under each seat of most aircraft and the same dimensions dictated by United. Defen-

dants, however, do not offer evidence contradicting plaintiffs' evidence showing that Continental employees are given discretion and are encouraged to allow larger and more bags onboard where appropriate, and that Continental's baggage policies have received positive publicity in the marketplace. Indeed, it is similarly undisputed that Continental's tariff also states that "the suitability of baggage as to weight, size, and character to be carried in the passenger compartment will be determined by Continental," and that "Continental reserves the right in its sole and absolute discretion to determine the suitability and place of storage of any item to be carried in the cabin of the aircraft." Thus, despite defendants' assertion to the contrary, there is, on this record, no material factual dispute with regard to Continental's policies and practices.

poses. It also invested in more manpower and equipment to improve baggage handling at several airports. Second, although Continental Express aircraft have less carry-on storage space in the main passenger compartment than do other modified Continental aircraft, passengers of the Express service can check and retrieve their bags at planeside, thereby eliminating the need to check bags at ticket counters and retrieve them at baggage claim.

Continental's carry-on baggage policies and practices have received marketplace recognition and accolades. In a 2000 J.D. Power and Associates survey, for example, Continental placed first in customer satisfaction among frequent fliers, who cited Continental's "superior performance at check-in" and baggage-friendly policies as critical to the airline's success.[8] Indeed, Continental has received five J.D. Power & Associates awards since 1996. The New York Times, moreover, has characterized Continental's carry-on policies as "the most carry-on-friendly" of the major airlines, and Air Transport World has named Continental "Airline of the Year."[9] In this regard, Continental believes that its approach to addressing the increased demand for greater onboard baggage capacity and for passenger-friendly carry-on baggage policies distinguishes it from other carriers and gives it a competitive advantage.

United responded differently. Although it appears that United, like Continental, also implemented a bin expansion program for its aircraft,[10] the main thrust of United's response, unlike Continental's, was to impose strict limits on the size and number of bags its passengers were allowed to carry onto the aircraft.[11] Specifically, in 1998, United began to restrict its passengers to two carry-on bags, each limited to 45 linear inches, or the approximate dimensions of the storage space under each seat on most United aircraft. To that end, United installed templates of this size on a test basis at the security checkpoints at Los Angeles International Airport, one of its hubs. This test indicated that a strict carry-on baggage policy risked alienating customers who want to avoid the risk of lost or delayed bags. Nevertheless, United thereafter sought to install carry-on baggage templates at other airports throughout the country, particularly at its several other hub airports.[12] The market response was less than enthusiastic. For example, after United installed templates at some airports and implemented a strict carry-on baggage policy, national accounts and high-revenue frequent fliers complained, some threatening to move their business to competitors with more lenient policies.[13] A United study conducted after the installation of templates at several airports reported that "[c]omplaints [concerning the strict limits on carry-on baggage

---

**8.** *Fliers give Continental sky-high marks*, USA Today, May 10, 2000, at 3B *in* PX 632.

**9.** *In Battle of Bags, Confusion Rules*, New York Times, February 21, 1999, at 4 *in* PX 616.

**10.** The record does not disclose the extent of United's bin expansion program.

**11.** United also lobbied Congress and the Federal Aviation Administration to adopt industry-wide standards for the size of carry-on baggage. A United study cited an advantage of such an establishment of industry-wide standards to be to "[l]evel[ ] the playing field by forcing all carriers to observe FAA mandated carry-on rules," while a strategic corpo-

rate communications plan listed one of United's business objectives to be to "[p]ersuade the FAA to establish and implement an industry wide standard that will satisfy safety issues, storage constraints and discard carry-on baggage as a competitive advantage or disadvantage." PX 56, 60.

**12.** There are United templates presently at about 25 domestic airports.

**13.** One such complaint came from the Chief Executive Officer of Northrop Grumman, who wrote to United that "[a]n ability to carry on bags is more important to me than the drink or the food, and will certainly influence my continued use of United in the future." PX 1034.

size] are increasing modestly," that "[f]ield management reports resistance from key customers," that "key customers have threatened to move their business," and that "[s]ervice quality ratings suggest that we have moved an onboard disservice to a lobby disservice." PX 59. Indeed, the same study concluded that "Continental's larger bins have provided a solution with more customer value." *Id.* Yet, despite these results, United sought to apply its restrictive carry-on baggage policies, including the use of carry-on baggage templates, at Dulles, one of United's major domestic hubs and one of the fastest-growing airports in the country. It is the manner in which United and the other defendants chose to implement this decision—effectively imposing the size restriction on all carriers at Dulles—that gave rise to this antitrust dispute.

In 1998, United proposed to the AMC membership that templates be installed at both security checkpoints at Dulles. In its review of the proposal, the AMC considered whether templates should be installed only at the East checkpoint, where the majority of United's customers are screened, or at both security checkpoints, as United proposed. The MWAA expressed concern that if templates were installed only at the East security checkpoint, passengers might choose to circumvent the templates by passing through the West checkpoint, thereby creating congestion at the West checkpoint. Nevertheless, as a trial, United installed carry-on baggage templates only at the East checkpoint on or about December 30, 1998. This trial was less than successful. As MWAA had predicted, many passengers avoided the East checkpoint templates, choosing instead to avoid the templates by entering the common sterile area through the West security checkpoint. This created congestion at the West checkpoint. At the end of the planned one-month trial period, the AMC instructed United to re-

move the baggage templates, but United refused. The template remained at the East checkpoint until the AMC hired a contractor to remove the templates in June 1999. United later agreed to pay for the costs of removal.

In January 2000, United proposed to reinstall carry-on baggage templates at Dulles. The AMC agreed to survey all carriers at Dulles to gauge support for, and to identify specific areas of concern over, a template program. Of the responding carriers, 16 favored and 6 opposed the proposed template installation. Following meetings to discuss the implementation of the carry-on baggage template program, the AMC, by a 21–to–5 margin, voted to install the templates at both security checkpoints at Dulles in March 2000.[14] Plaintiffs, joined by four other carriers, voted against the agreement and communicated to the other members of the AMC their view that the agreement would restrict and inhibit competition. Despite plaintiffs' opposition, the templates were installed at the checkpoints on April 15, 2000. And, the AMC, in cooperation with MWAA, placed signs at common airport locations and advertisements in the MWAA's official magazine to educate passengers about the templates. Thus, as of April 15, 2000, defendants had implemented their agreement to restrict the size of carry-on baggage for all airlines at Dulles. That restrictive agreement remains in effect.

United and its fellow AMC members also adopted a so-called "Medallion" program as a safety valve for use in conjunction with the installation of carry-on baggage templates at the Dulles security checkpoints. Pursuant to this program, United distributed to each carrier a limited number of tokens, called "Medallions," that allowed certain passengers to bypass the templates at the security checkpoints

---

**14.** The "ballots" instructed that the failure to return a ballot would be deemed a vote in favor of the templates. Six airlines did not respond and, therefore, were included with 15 voting carriers as favoring the installation of the templates at both security checkpoints.

and carry onboard the aircraft larger-sized bags than those allowed to non-Medallion holders. It is clear from the record that Medallions were designed to be used sparingly and given only to high-yield customers—that is, first class, business class, and "VIP" coach passengers—and not to all passengers. In fact, the initial distribution of Medallions was limited in just this fashion, as United allocated to each carrier a number of Medallions in proportion to the carrier's first-class, business-class, and "VIP" customers, as estimated by the carrier. The Medallions themselves, moreover, appear to have had the statement, "VIP Use at Washington Dulles Only" or "VIP ONLY" inscribed on them.[15]

Continental distributed to its passengers all of the Medallions it was initially issued, but made no further attempt to obtain more Medallions from the AMC or United. Instead, Continental posted employees at the Dulles security checkpoints to assist Continental passengers with bags that would otherwise not fit through the carry-on baggage templates. These Continental employees handed out notices to its customers disclaiming responsibility for any delays caused by the templates and informing them that Continental representatives were available to assist them in clearing the checkpoint. Continental also posted signs at the security checkpoints at Dulles indicating the airline's disapproval of the templates, although these signs ultimately were removed by the MWAA. On July 1, 2000, Continental hired a third-party contractor—at a cost of approximately $10,000 per month—to provide personnel dressed in Continental uniforms and stationed at the West security checkpoint to lift the templates for Continental customers and to continue distributing Continental's notices.

On April 24, 2000—within approximately one week after the carry-on baggage templates were installed at Dulles—Continental filed the instant action. Continental's five-count complaint against defendants stated claims for (i) violation of the Section 1 of the Sherman Act, 15 U.S.C. § 1, (Count I) and the corresponding Virginia statutory provision, Va.Code § 59.1–9.5, (Count II); (ii) intentional interference with contractual relations (Count III) and with prospective economic advantage (Count IV); and (iii) violation of the Virginia Business Conspiracy Statute, Va.Code § 18.2–499 (Count V). For the reasons stated in a Memorandum Opinion, plaintiffs' state-law claims—namely, Counts II through V—were dismissed as preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b). *See Continental Airlines, Inc. v. United Air Lines, Inc.*, 120 F.Supp.2d 556 (E.D.Va.2000). Accordingly, only Count I—the Sherman Act Section 1 claim—remains for adjudication.

Defendants, in their summary judgment papers, argue that plaintiffs have failed to prove that defendants' carry-on baggage size restriction (i) materially harms compe-

---

15. PX 31. The record includes a letter sent by United's security manager at Dulles, John Bentley, to the various airline managers at Dulles to solicit information regarding the number of Medallions each carrier would require. In the letter, Bentley informed the managers that "[t]he Medallions are intended for sparing use in clearing larger size carry-on items through the Templates at the Screening Checkpoints for your 'special passengers.'" PX 32. Attached to this letter, moreover, was a form on which each carrier was to designate (i) aircraft type, (ii) number of aircraft of that type, (iii) the capacity of the aircraft, (iv) the aircraft's first class capacity, (v) the aircraft's business class capacity, and (vi) the "Expected [number of] Other VIP's [sic]." *Id.* Also in the record are notes of "Action Items" from a template implementation meeting held on March 13, 2000. Included in this document is the following statement further reflecting the limited nature of the Medallion program: "Determine United exception token need based on # of flights and first and business class seat # 's.... Create a form for carriers to fill out requesting the same info from them .... Jack." PX 27. Yet another document to the same effect are the minutes of an AMC meeting on April 13, 2000, that refer to "[f]irst class and VIP Medallion[s]." PX 38. Thus, the current record is undisputed that the Medallion program was limited in scope and not intended to apply to all passengers.

tition under the Rule of Reason, or (ii) caused Continental to suffer the requisite "antitrust injury." Defendants also argue that their agreement is exempt from antitrust scrutiny under the state-action doctrine. Continental, for its part, argues that it is entitled to summary judgment because defendants' agreement to restrict the size of carry-on baggage at Dulles is a naked restriction on nonprice competition among air carriers—illegal on its face or under the Rule of Reason—that injures Continental by eliminating any competitive advantage Continental has by virtue of its expanded aircraft baggage storage bins and its liberal carry-on baggage policies and practices.

## II.

The standards governing the disposition of the parties' cross-motions for summary judgment have been well-settled since the *Celotex* trilogy of cases from the Supreme Court. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In essence, where, as here, there is an extensive factual record and "the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, show that there is no genuine issue as to any material fact," resolution of the dispute as a matter of law is appropriate.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The inquiry into whether there is a genuine issue of material fact—that is, whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"—must be undertaken by viewing the evidence in a light most favorable to the nonmoving party.[16] In any event, "there is no 'genuine issue for trial'" where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Nguyen v. CNA Corp.,* 44 F.3d 234, 237 (4th Cir.1995) (quoting *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348).

Nor is there any doubt that these standards also apply to antitrust cases, where "the unusual entanglement of legal and factual issues ... may be particularly well-suited for Rule 56 utilization."[17] Because "'[t]he very nature of antitrust litigation encourages summary disposition of such cases when permissible,'" courts have recognized that "summary judgment is an important tool for dealing with antitrust cases." *Oksanen v. Page Mem'l Hosp.,* 945 F.2d 696, 708 (4th Cir.1991) (quoting *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 475 (7th Cir.1988)).[18]

## III.

Although Section 1 of the Sherman Act condemns literally *all* agreements that restrain trade,[19] courts, early in the Act's history, sensibly construed the section to reach only *unreasonable* restraints.[20]

---

**16.** *Anderson,* 477 U.S. at 248, 255, 106 S.Ct. 2505; *see Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348 (1986); *Nguyen v. CNA Corp.,* 44 F.3d 234, 236–37 (4th Cir.1995); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

**17.** *Thompson Everett, Inc. v. National Cable Adver., L.P.,* 57 F.3d 1317, 1322 (4th Cir. 1995); *see also Oksanen v. Page Mem'l Hosp.,* 945 F.2d 696, 708 (4th Cir.1991).

**18.** Indeed, *Matsushita,* one of the *Celotex* trilogy, was a Sherman Act Section 1 suit that alleged a price-fixing scheme by television manufacturers. *See Matsushita,* 475 U.S. at 577–78, 106 S.Ct. 1348.

**19.** Section 1 of the Sherman Act provides, "Every contract, combination[,] ... or conspiracy, in restraint of trade or commerce among the several States ... is hereby declared to be illegal." 15 U.S.C. § 1.

**20.** *See, e.g., Bd. of Trade of City of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918) ("Every agreement concerning trade, every regulation of trade, restrains."); *Standard Oil Co. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *Advanced Health-Care Servs., Inc. v. Radford Community Hosp.,* 910 F.2d 139, 144 (4th Cir.1990).

Thus was born the judicial gloss familiarly known as the "Rule of Reason," a term now recognized as describing the modes of analysis designed to enable courts to ferret out and identify those restraints of trade that are unreasonable, i.e., those that are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911). In a real sense, Rule of Reason analysis is the lens through which courts examine the competitive impact of a restraint.[21]

■ Courts assessing a restraint's reasonableness under Section 1 have devised three modes of analysis for this purpose: (i) *per se* analysis, (ii) full Rule of Reason analysis, and (iii) an "abbreviated" Rule of Reason analysis. Each of these is appropriate for a distinct category of restraints. *Per se* analysis applies to those restraints,

e.g., price-fixing,[22] market-allocation agreements among competitors,[23] tying arrangements,[24] and group boycotts,[25] that are deemed unlawful *per se* because they "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, ... [that] they are deemed unlawful *per se*."[26] Courts have determined over the years that these types of restraints "facially appear[ ] to be one[s] that would always or almost always tend to restrict competition and decrease output," and are not "designed to 'increase economic efficiency and render markets more, rather than less competitive,'" such that they may be deemed unreasonable and therefore unlawful under the Sherman Act without the need to conduct a detailed study of the markets in which such restraints operate or of their actual effect on competition.[27]

**21.** *See, e.g., National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 690, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) ("[T]he purpose of the [Rule of Reason] analysis is to form a judgment about the competitive significance of the restraint . . . ."); *Standard Oil*, 221 U.S. at 60, 31 S.Ct. 502 ("The standard of reason ... was intended to be the measure used for the purpose of determining whether, in a given case, a particular act had or had not brought about the wrong against which [Section 1 of the Sherman Act] provided.").

**22.** *See, e.g., Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 354, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 221–23, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 396–98, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

**23.** *See, e.g., Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam); *United States v. Topco Assocs.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

**24.** *See, e.g., International Salt Co. v. United States*, 332 U.S. 392, 396–99, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

**25.** *See, e.g., Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

**26.** *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *see North-*

west Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (noting that the *per se* approach "permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive"). While many courts view *per se* treatment as distinct from Rule of Reason analysis, the better view is that *per se* rules are merely special applications of the Rule of Reason for certain classes of restraints that experience shows will always or almost always fail the Rule of Reason. *See* VII Phillip E. Areeda, Antitrust Law ¶¶ 1509–10, pp. 408–27 (1986) (arguing that a *per se* rule is "a class application of the rule of reason," and "[t]he root meaning of 'per se illegality' is that courts refuse to consider one or more factors that would ordinarily bear on the reasonableness of challenged conduct").

**27.** *Broadcast Music Inc., v. Columbia Broad. Sys.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)); *see Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) ("[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.").

Because a finding of *per se* illegality by definition summarily finds a violation of the

■ Full Rule of Reason analysis applies to a broader category of restraints, the reasonableness of which cannot be ascertained without a more thorough analysis of their beneficial and pernicious effects in the relevant product[28] and geographic markets.[29] Restraints of this sort may well be anticompetitive, but they are not facially or unambiguously so. A full market analysis is needed to assess whether the challenged restraint is indeed destructive of open competition in the market.[30]

■ A final category of restraints fits into neither of the previous categories;

their pernicious effects on competition are evident without the benefit of a full Rule of Reason analysis, yet they do not deserve *per se* treatment, as their overall reasonableness cannot be ascertained without a preliminary assessment of their procompetitive effects. For this category of restrictions, courts have applied an "abbreviated" or "quick look"[31] form of Rule of Reason analysis. This third mode of analysis skips the inquiry into anticompetitive effects because those effects are manifest from the nature of the restraint; instead, the focus of the abbreviated Rule of Rea-

Sherman Act, *per se* treatment is appropriate only when " 'experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.' " *State Oil*, 522 U.S. at 10, 118 S.Ct. 275 (quoting *Maricopa County Med. Soc.*, 457 U.S. at 344, 102 S.Ct. 2466); *see, e.g., Broadcast Music, Inc.*, 441 U.S. at 19 n. 33, 99 S.Ct. 1551. That is, courts should apply the per se rule "only when history and analysis have shown that in sufficient similar circumstances the rule of reason unequivocally results in a finding of liability, i.e., when the conduct involved always or almost always tend[s] to restrict competition and decrease output." *Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1549 (11th Cir.1996) (citations omitted). Conversely, therefore, where "the economic impact of certain practices is not immediately obvious," per se treatment is inappropriate. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458–59, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986).

28. The relevant product market "identifies the products or services that compete with each other." *America Online, Inc. v. GreatDeals.Net.* 49 F.Supp.2d 851, 857 (E.D.Va. 1999). Specifically, "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it" defines the relevant product market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *see also United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (holding that, for antitrust purposes, the relevant market "is composed of products [or services] that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered"); *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 622–23 (6th .Cir.1999) (noting that "[t]he relevant market includes

those products or services that are reasonable interchangeable with, as well as identical to, defendant's product").

29. The relevant geographic market "identifies the geographic area within which competition takes place." *America Online*, 49 F.Supp.2d at 857. It is "the area of effective competition" in which consumers may reasonably be expected to turn to alternative sources of supply if the price of the product in the product market increases. *Standard Oil*, 337 U.S. at 299 n. 5, 69 S.Ct. 1051.

30. *NCAA v. Board of Regents*, 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *accord Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n. 46, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *see also Oksanen*, 945 F.2d at 709 (holding that to meet the burden of establishing an unreasonable restraint of trade, an antitrust plaintiff "must prove what market he contends was restrained and that the defendants played a significant role in the relevant market," for "[a]bsent this market power, any restraint on trade created by defendants' actions is unlikely to implicate section one"); *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir.1983) (holding that plaintiffs must establish the relevant product and geographic market).

31. The term "quick look" was coined by the Seventh Circuit in 1984 to refer to the clarity of a restraint's anticompetitive nature and effect, and by no means connotes superficiality or inadequacy in the analysis. *See General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir.1984) ("[I]f the elimination of competition is apparent on a quick look, without undertaking the kind of searching inquiry that would make the case a Rule of Reason case in fact if not in name, the practice is illegal *per se*.").

son analysis is on the procompetitive justifications offered in support of the restraint. *See California Dental Assoc. v. FTC,* 526 U.S. 756, 769–71, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999); *NCAA v. Board of Regents,* 468 U.S. 85, 109, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("*NCAA* "); *Law v. NCAA,* 134 F.3d 1010, 1020 (10th Cir.1998) ("*LAW* "). Thus, while an antitrust plaintiff ordinarily bears the threshold burden of defining the relevant product and geographic market and of showing that competition in that market has been significantly injured,[32] a plaintiff need not *always* do so in order to prevail under Section 1 of the Sherman Act. Rather, as the Supreme Court has stated, under appropriate circumstances " 'the rule of reason can ... be applied in the twinkling of an eye,' " for, "[a]s a matter of law, the absence of proof of market power does not justify a naked restriction on price or output," and a "naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis."[33]

*California Dental Association v. FTC,* 526 U.S. 756, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999) ("*CDA* "), provides guidance on when the abbreviated Rule of Reason analysis is appropriate. There, the Supreme Court instructed that courts may dispense with full Rule of Reason analysis and proceed to assess procompetitive justifications for a challenged restraint where the anticompetitive effects of the restraint are so obvious that "an observer with even a rudi-

mentary understanding of economics could conclude that the agreement[ ] in question would have an anticompetitive effect on customers and markets." *Id.* at 770, 119 S.Ct. 1604. Where the agreement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," however, an "indulgently abbreviated review" of the restraint is inappropriate. *Id.* at 771–78, 119 S.Ct. 1604. In such situations,

> before a theoretical claim of anticompetitive effects can justify shifting to the defendant the burden to show empirical evidence of procompetitive effects, as quick-look analysis in effect requires, there must be some indication that the court making the decision has properly identified the theoretical basis for the anticompetitive effects and considered whether the effects actually are anticompetitive.

*Id.* at 775 n. 12, 119 S.Ct. 1604. Yet, *CDA* makes clear that this "is not ... necessarily to call for the fullest market analysis" in identifying this theoretical basis and the actual effects. *Id.* at 779, 119 S.Ct. 1604. Simply put, *CDA* confirms that not every restraint that escapes *per se* treatment "is a candidate for plenary market examination"; rather, *CDA* teaches that the Rule of Reason is a highly flexible inquiry and that "[w]hat is required is an enquiry meet for the case, looking to a restraint's circumstances, details, and logic." *Id.* at 779, 781, 119 S.Ct. 1604.[34] The object of the

32. *See, e.g., Oksanen,* 945 F.2d at 709.

33. *NCAA,* 468 U.S. at 109–10 & n. 39, 104 S.Ct. 2948 (quoting Phillip Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (1981) (parenthetical omitted)); *see, e.g., FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 459–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *Law,* 134 F.3d at 1019 n. 11 ("A naked, effective restraint on market price or volume can establish anticompetitive effect under a truncated rule of reason analysis."); *General Leaseways v. National Truck Leasing Ass'n,* 744 F.2d 588, 595 (7th Cir.1984).

34. In *CDA,* the Supreme Court held that the Ninth Circuit erred in concluding that an

ethical rule promulgated by a nonprofit association of dental societies was sufficiently anticompetitive on its face to shift the burden to the association to offer procompetitive justifications for the restraint, without first "scrutiniz[ing] the assumption of relative anticompetitive tendencies." *Id.* at 781, 119 S.Ct. 1604. The challenged rule restricted member dentists to advertising that was not "false or misleading in any material respect." *Id.* The Supreme Court concluded that it was not prima facie obvious that the rule would have any effect at all on competition, let alone a negative one. The professional context within which the restraint operated rendered plausible the association's argument that the

analysis "is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one." *Id.* Thus, "a challenge to a 'naked restraint on price and output' need not be supported by a 'detailed market analysis' in order to 'requir[e] some competitive justification,'" but an attack on a less-obviously-anticompetitive restraint demands a more assiduous examination as is needed to resolve any doubts about the net anticompetitive effects of the restraint. *Id.* at 779, 119 S.Ct. 1604 (quoting *NCAA*, 468 U.S. at 110, 104 S.Ct. 2948).[35]

To determine which Rule of Reason mode of analysis applies here, it is necessary first to lay bare the nature of the restraint at issue. The first step in doing so is to understand the nature of competition for passengers among airlines. To be sure, airlines compete on the basis of the price of a ticket. But this is not the only basis on which airlines compete; they also compete on various other grounds, including on-time performance, convenience of schedule, onboard meal and drink service, passenger comfort, and carry-on baggage policy.[36] Put differently, air carriage service is a product consisting of numerous aspects, all of which are subjects of inter-

restraint would in fact promote competition by eliminating misleading advertising. The Ninth Circuit, therefore, too quickly presumed that the restraint would have anticompetitive effects and too quickly shifted the burden to the association to offer procompetitive justifications for the restraint. *See id.* at 775–77, 119 S.Ct. 1604. On remand, the Ninth Circuit sustained the restraint under a full Rule of Reason analysis. *See California Dental Assoc. v. FTC*, 224 F.3d 942 (9th Cir. 2000).

**35.** Although courts subjecting restraints to Section 1 scrutiny generally recognize three modes of Rule of Reason analysis, this is not to say that the lines of demarcation separating them are rigid and certain; rather, as one respected commentator has observed, the three modes are probably more accurately viewed as existing on an analytical continuum, with the requisite degree of scrutiny and market analysis varying as required by the nature of the restraint. *See* XI Herbert Hovenkamp, Antitrust Law ¶ 1911, p. 266 (1998) ("[T]he amount and range of information needed to make a conclusion of unreasonableness, or illegality, cannot be pigeon-holed into two forms of inquiry, per se and rule of reason. But neither can it readily be pigeon-holed into three. At the two extremes the domain of the inquiry is easily stated: under the per se rule power, intent, effect, and most defenses are irrelevant; under the rule of reason all are essential. But in the middle area differing amounts and types of information may be necessary to enable a court to make a judgment of reasonableness. For highly suspicious but somewhat unique restraints, perhaps an examination and rejection of proffered defenses will be sufficient. For somewhat less suspicious restraints, no

judgment of effects can be made without some inquiry into market structure or power.").

**36.** Nor is there any doubt that carry-on baggage policy is an element of competition that is important to many consumers. Although defendants attempt to quibble with this fact by grudgingly conceding that carriers compete at some level on carry-on baggage policies, but arguing that such policies are "a trivially small aspect of airline competition," the record unambiguously discloses that airline carry-on policy is not an insignificant aspect of airline competition. Defendants' Response to Plaintiffs' Statement of Undisputed Facts, No. 10, at 5. Indeed, it is beyond dispute that United was *aware* that carry-on policy is an important element of competition among airlines, as the record contains evidence of (i) United's analysis of its Des Moines experiment, which predicted market share loss were passengers limited to one carry-on bag *and* other competitors did not follow suit; (ii) United's experience with baggage templates at several hubs, where United saw "resistance from key customers" and received threats from customers to fly on other airlines instead, PX 59; (iii) United's conclusion that "UA [was] at [a] competitive disadvantage for onboard carry-on storage due to competitors operating MD80 and B757 with an extra closet," PX 69 at 1881; and (iv) United's admission that the justification for lobbying the FAA to impose an industry standard for carry-on baggage size was to "discard carry-on baggage as a competitive advantage or disadvantage," to "[l]evel[ ][a] competitive problem for UA," and "to level the playing field for carry-on baggage," PX 60 at 1; PX 58 at 4476; PX 56 at 4704; PX 596.

airline competition. All of these aspects, including carry-on baggage policy, constitute relevant output on which basis airlines compete, for "all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers." *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). In other words, a carrier's output has both quantitative and qualitative aspects. In the words of one respected commentator,

> [R]elevant output can be measured by a number of means. The most obvious is the number of units sold. Perhaps the second most obvious is the quality of the units. If macaroni manufacturers agree with one another to substitute 50 percent inferior farina wheat when making their product, rather than using 100 percent durum semolina wheat, this agreement may have little impact on the number of pounds of macaroni they sell. But in this case the agreement to make a good of inferior quality would count as the output reduction.

XI Herbert Hovenkamp, Antitrust Law ¶ 1901, p. 187 (1998).

Similarly, while defendants' agreement to restrict the size of carry-on bags may have little impact on the total number of flights offered or tickets sold, it does amount to an agreement to provide a lower quality product and hence counts as an output reduction. It restricts output because it standardizes, and thereby eliminates open competition on, an element of the bargain between carriers and passengers.[37] And, further, the carry-on baggage size restriction is a horizontal output restriction because the agreement was formed by rivals and eliminates rivalry on the basis of carry-on policy among all participants.[38] As a consequence, defendants' agreement restricts product and service diversity and constrains innovation competition in the market for air carriage.[39] In this regard, it is elementary economics that insofar as defendants' restriction standardizes an element of competition and prevents airlines like Continental from offering a better product and superior service to consumers with regard to carry-on baggage capacity and policies, the economic effect of the restriction is no different from the effect of a horizontal agreement among competitor airlines to fix the price

---

**37.** As the record reflects, defendants installed carry-on baggage templates at Dulles security checkpoints to prevent passengers of all carriers at the airport from passing through security checkpoints with carry-on bags exceeding defendants' agreed standardized size. The primary effect of the restriction, therefore, is to standardize the size of bags that passengers may carry onto the aircraft at Dulles. This, in turn, prevents carriers such as Continental from offering passengers (i) the ability to carry onto Continental aircraft larger bags, or (ii) a flexible carry-on baggage policy that would allow their bags either to be carried onto the aircraft when circumstances particular to individual flights permit or to be checked planeside or at the gate—thereby at least allowing passengers to avoid the inconvenience of being processed at the main terminal ticket counter.

**38.** *See* XI Herbert Hovenkamp, Antitrust Law ¶ 1901, p. 185–86 (1998) ("An agreement is said to be 'horizontal' when (1) its participants are *either* (a) actual rivals at the time

the agreement is made or (b) potential rivals at the time the agreement is made; *and* (2) the agreement eliminates some avenue of rivalry among participants.").

**39.** *See id.* ¶ 1902, p. 192 ("[E]ven well-intentioned horizontal agreements can eliminate at least some avenues along which competition might occur. In the most threatening circumstances, such as naked price fixing, the consequences of this loss of competition are immediate and obvious. But the harmful results can be present even in circumstances that appear quite benign. For example, a product or format standardization agreement among makers of high-definition television or videotapes may enable participants to develop a more secure market for their product; but once such an agreement is put in place it also increases significantly the costs to any firm of trying to innovate alternatives to the product that is the subject of the agreement. Thus the result may be not only reduced production and development costs, but also reduced incentives toward further innovation. ").

of air carriage service for consumers. As the Supreme Court teaches,

> A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them.[40]

Put differently, defendants' agreement distorts the allocation of services through the operation of the airline market mechanism and thereby substantially reduces aggregate consumer welfare as does fixing the price of airline tickets.

■ Given this, Continental argues that defendants' agreement to restrict the size of carry-on bags at Dulles should be accorded *per se* treatment, as it is clearly an agreement among competitors to eliminate competition with respect to carry-on baggage policy. It is, Continental contends, the type of cartel output limitation deserving of *per se* treatment as having no purpose other than to stifle competition and thereby to secure supracompetitive profits

for cartel members. *See Broadcast Music, Inc. v. Columbia Broad. Sys.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Defendants, for their part, cling tenaciously to the notion that *per se* treatment is limited to price-fixing, group boycotts, market allocations, and tying arrangements and hence is inapplicable to the carry-on baggage restriction, which is none of these.

Neither side is correct. Contrary to defendants' contention, *per se* treatment is not limited to the few types of restraints historically so treated; judicial scrutiny may reveal that new types of restraints—restraints beyond those in the traditional *per se* categories—merit *per se* treatment. And, contrary to Continental's contention, although horizontal output restrictions typically warrant *per se* treatment,[41] this is not invariably so. In some circumstances, the context, purpose, and nature of a horizontal output restraint are such as to call for at least an abbreviated application of the Rule of Reason to allow consideration of any plausible procompetitive effects of the restraint.

---

**40.** *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (citations omitted and quoting *National Soc'y of Prof'l Eng'rs*, 435 U.S. at 692, 98 S.Ct. 1355); *see also General Leaseways, Inc. v. National Truck Leasing Assn.*, 744 F.2d 588, 594–95 (7th Cir.1984) ("An agreement on output also equates to a price-fixing agreement. If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects"); Robert H. Bork, The Antitrust Paradox 85 (1978) (noting that because "[l]eisure and money are merely different forms of income for producers and different forms of payment by consumers," there is no economic difference between an agreement by car dealerships to raise nominal car prices and an agreement to reduce hours of operation, for "[b]oth are limitations upon competition whose sole purpose is to increase the dealer's income by restricting output").

**41.** *See, e.g., NCAA*, 468 U.S. at 99, 104 S.Ct. 2948 (noting that "an agreement among competitors on the way in which they will compete with each other .... has often been held to be unreasonable as a matter of law, and that where "the challenged practices create a limitation on output[,] ... our cases have held that such limitations are unreasonable restraints of trade"). As the Supreme Court has taught, a "[h]orizontal ... output limitation" [is] ordinarily condemned as a matter of law under an "illegal *per se* approach because the probability that these practices are anticompetitive is so high," and "[i]n such circumstances a restraint is presumed unreasonable without inquiry into the particular market in which it is found." *Id.* at 100, 104 S.Ct. 2948. "[T]he likelihood that horizontal ... output restrictions are anticompetitive," the Court added, "is generally sufficient to justify application of the *per se* rule without inquiry into the special characteristics of a particular industry." *Id.* at 100 n. 21, 104 S.Ct. 2948.

■ This case presents precisely such circumstances. Defendants operate out of shared airport facilities and thus must form agreements from time to time concerning the use of these facilities. Some agreements of this sort may further procompetitive goals. Defendants' agreement to restrict carry-on baggage size at Dulles purports to be such an agreement. Thus, although defendants' agreement is a horizontal output restriction—a "paradigmatic example[ ] of [a] restraint[ ] of trade that the Sherman Act was intended to prohibit"—it may, in context, have justifications that merit an abbreviated application of the Rule of Reason.[42] In this regard, any such justifications must be considered to determine their plausibility and materiality to competition. If the analysis discloses that the proffered procompetitive justifications are plausible and material to competition, then the abbreviated Rule of Reason analysis must give way to a more "sedulous" Rule of Reason analysis, perhaps even a to full analysis of the relevant product and geographic markets and the restraint's effect in those markets. *CDA*, 526 U.S. at 781, 119 S.Ct. 1604. On the other hand, if the analysis reveals that the proffered justifications are implausible or immaterial, then the inquiry into the restraint's illegality is complete. *See id.* at 778, 119 S.Ct. 1604 ("[T]he plausibility of competing claims about the effects of the . . . restriction[ ] rules out . . . abbreviated review, [for] . . . [t]he obvious anticompetitive effect that triggers abbreviated analysis [will not have] been shown.").

*NCAA v. Board of Regents,* is analogous and instructive on this point. At issue there was the NCAA's limitation on the total amount of televised intercollegiate football games and the number of games that any one member college may televise. While recognizing that by "plac[ing] an artificial limit on the quantity of televised football that is available to broadcasters and consumers" the NCAA's limitation was a restriction on output that would ordinarily be condemned as illegal *per se* under the Sherman Act, the Supreme Court nonetheless decided that *per se* treatment was inappropriate, for the case "involve[d] an industry in which horizontal restraints on competition are essential if the product is to be available at all." *NCAA,* 468 U.S. at 101, 104 S.Ct. 2948. There was, in other words, a plausible justification or procompetitive effect that merited an abbreviated Rule of Reason analysis. Similarly, here too, it cannot confidently be concluded that there are no plausible procompetitive justifications for any horizontal agreement among air carriers that restricts output. Thus, an abundance of caution and a concern that too cavalier an application of the *per se* rule would "introduc[e] an unintended and undesirable rigidity in the law" counsel against declaring defendants' agreement to be *per se* illegal. *Continental T.V.,* 433 U.S. at 50 n. 16, 97 S.Ct. 2549. In sum, although the anticompetitive tendencies of defendants' agreement are manifest,[43] the

---

**42.** *Id.* at 107–08, 104 S.Ct. 2948.

**43.** Even were the anticompetitive effect of defendants' agreement not so obvious, plaintiffs have clearly offered proof of anticompetitive effects. It is well-settled that because "the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.' " *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)

(quoting 7 Phillip E. Areeda, Antitrust Law ¶ 1511, p. 429 (1986)). In this regard, actual anticompetitive effects may be manifested in the form of a "reduction of output, increase in price, or deterioration in quality of goods or services." *United States v. Brown Univ.,* 5 F.3d 658, 668 (3d Cir.1993). Here, the record discloses that because defendants' carry-on baggage size restriction has effectively eliminated competition on this basis, it has reduced product diversity, discouraged product innovation, and restricted the ability of competing airlines to offer better carry-on baggage policies, which is a form of output for carriers. As a result, the quality of airline service at Dulles has deteriorated, as defen-

relative novelty of the context that spawned the agreement (a busy hub airport) cautions against proceeding too hastily to condemn the agreement as illegal *per se* under the Sherman Act. A preliminary assessment of the plausibility of defendants' claimed justifications for their agreement under an abbreviated application of the Rule of Reason is required before the agreement may be condemned as unreasonable and therefore illegal.[44]

## IV.

Defendants offer three justifications in support of the carry-on baggage size restriction. First, defendants claim that restricting carry-on baggage size through the use of the templates improves carrier on-time performance. Such a restriction, defendants argue, saves boarding time by reducing instances of passengers trying to find onboard stowage space for their "oversized" bags and thereby preventing

others from taking their seats, or of flight attendants unable to close the cabin door because of the need to gate-check a bag for which stowage space cannot be found in the main cabin. Second, defendants argue that their agreement enhances onboard safety, as such a restriction purportedly minimizes the risk of oversized carry-on bags forced into bins falling on customers and airline employees. Finally, defendants contend that the carry-on restriction facilitates passenger comfort and convenience by allowing more passengers—including late-arriving passengers—to find some room on the aircraft for their carry-on bags.

Plaintiffs dispute all three proffered justifications. They point out that the record discloses that carry-on baggage delays comprise no more than 0.9% of all delays and 0.1% of the duration of all delays at Dulles and that the restriction, therefore, has little or no effect on reducing delays.[45]

---

dants' restraint prevents passengers from taking advantage of baggage-friendly policies that would otherwise be offered at least by Continental and perhaps by other airlines at Dulles.

**44.** Indeed, the circumstances of this case are analogous, if not identical, to those in *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). At issue there was an agreement among the members of a dentists' trade association to withhold x-rays requested by insurers to evaluate claims for benefits. The Supreme Court recognized that the agreement was an obvious horizontal restraint on output of a service desired by insurers and patients, and hence it was unnecessary to analyze the relevant product and geographic markets before requiring the association to come forward with procompetitive justifications, for, " '[a]s a matter of law, the absence of proof of market power does not justify a naked restriction on price or output,' and such a restriction 'requires some competitive justification even in the absence of a detailed market analysis.' " *Id.* at 460, 106 S.Ct. 2009 (quoting *NCAA*, 468 U.S. at 109–10, 104 S.Ct. 2948). There, as here, the restraint "takes the form of a horizontal agreement among [competitors] to withhold from their customers a particular service that they desire," and " '[w]hile this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive

character of such an agreement.' " *Id.* at 459, 106 S.Ct. 2009 (quoting *National Soc'y of Prof'l Eng'rs*, 435 U.S. at 692, 98 S.Ct. 1355). In such a case, the agreement "may still survive scrutiny under section 1 if the procompetitive benefits of the restraint justify the anticompetitive effects," *Law*, 134 F.3d 1010, 1021 (10th Cir.1998), but

[a]bsent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services—such an agreement limiting consumer choice by impeding the 'ordinary give and take of the marketplace' cannot be sustained under the Rule of Reason.

*Indiana Fed'n of Dentists*, 476 U.S. at 459, 106 S.Ct. 2009 (citations omitted and quoting *National Soc'y of Prof'l Eng'rs*, 435 U.S. at 692, 98 S.Ct. 1355).

**45.** Plaintiffs take issue with defendants' assertion that the record contains evidence that templates reduced delays attributable to carry-on baggage "up to 72% in Chicago" as comparing only one week of pre-template date with the singe most favorable data point after templates were installed at Chicago O'Hare International Airport. Applying this same analytical method to Dulles, plaintiffs argue, discloses that carry-on templates *increased* gate-checked delays up to 200% in 1999 and 8.3% in 2000. In this regard, plain-

Continental also points out it has not suffered a delay at Dulles because of its more liberal carry-on baggage policy and, instead, has achieved better on-time performance with its policy than has United with its rigid restriction. Further, plaintiffs argue that there is no evidence that the boarding process is smoother with the restriction than without. As for safety, plaintiffs contend that safety is not a function of the size, weight, or shape of carry-on bags, but rather of how well the bags are stowed on the aircraft; thus, defendants' size restriction bears no direct relationship to onboard safety. Finally, plaintiffs assert that passenger comfort and convenience are not legitimate justifications at all, but rather are elements of competition among airlines that should not be restrained.

■ The parties' divergent interpretations of the evidence concerning the proffered justifications suggest a dispute of fact. Yet, this dispute does not bar summary judgment unless it is material. In this regard, for purposes of Section 1 of the Sherman Act, "[j]ustifications offered under the rule of reason may be considered only to the extent that they tend to show that, on balance, 'the challenged restraint enhances competition.'"[46] This is so because Rule of Reason analysis "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason"; rather, the sole inquiry under the Sherman Act is whether the restraint "is one that promotes competition or one that suppresses competition." *National Soc. of Prof'l Eng'rs*, 435 U.S. at 688, 691, 98 S.Ct. 1355. Thus, justifications supporting only propositions other than that competition is enhanced by the restraint at issue are irrelevant, for "merely offering a rationale for a ... restraint will not suffice"; rather, "the record must support a finding that the restraint ... does indeed have a procompetitive effect." *Graphic Prods. Distribs. v. Itek Corp.* 717 F.2d 1560, 1576 (11th Cir.1983).

■ These principles compel the conclusion that defendants have failed to identify any valid, competition-enhancing effects of their agreement to restrict carry-on baggage size at Dulles. There is no record support for the proposition that an agreement to standardize carry-on baggage size corrects a failure in the market for air carrier services and, therefore, promotes competition among carriers.[47] Nor is there evidence that there are legitimate efficiencies created by defendants' joint action.[48]

tiffs contend that the effect templates had on reducing delays is unmeasurable. Indeed, plaintiffs point out that on-time departure data at airports with templates is no better than that at airports without templates. *See* PX 310 at 9 (United States Department of Transportation "Air Travel Consumer Report" for September 2000 disclosing that only 54.1% of flights departed on-time from Denver International Airport (a United hub with carry-on baggage templates installed), while 83.1% of flights departed on time from Houston (a Continental hub with no carry-on baggage templates installed)).

46. *Law,* 134 F.3d 1010, 1021 (10th Cir.1998) (quoting *NCAA,* 468 U.S. at 104, 104 S.Ct. 2948); *see* XI Herbert Hovenkamp, Antitrust Law ¶ 1913, p. 303 (1998) ("The defendant is ... entitled to show that the restraint in fact has 'redeeming virtues'—which is another way of saying that integration or a potential for efficiencies exists that tends to make the overall impact of the restraint procompetitive, or output increasing.").

47. Unlike in *CDA,* for example, where information failure in the market for dental services justified a restriction on advertising intended to limit deceptive advertising, there is simply no failure in the market for airline carry-on baggage capacity and policies to justify defendants' agreement. *See CDA,* 119 S.Ct. at 1614–15 ("Assuming that the record in fact supports the conclusion that CDA disclosure rules essentially bar advertisement of across-the-board discounts, it does not obviously follow that such a ban would have a net anticompetitive effect here.").

48. *Cf.* XI Herbert Hovenkamp, Antitrust Law ¶ 1902, p. 191 (1998) ("Horizontal agreements often increase output, and thus are deemed procompetitive, when joint activity reduces the cost or risk facing individual firms or enables them to develop a product or

Simply put, there is no evidence that the unrestrained market cannot provide the correct quality of airline service, or, specifically, that open competition among carriers on the basis of carry–on baggage capacity and policies cannot achieve the very goals defendants purport to seek to achieve.

Indeed, if there is any proof of failure in the market to be gleaned from the record, it is of United's failure to provide what its customers desire. The common thread uniting all three of defendants' suggested procompetitive effects—i.e., improved on-time performance, safety, and passenger convenience and comfort—is the fact that some airlines are *not able (or willing) to* provide the onboard storage capacity and carry-on baggage policies that the flying public wants. In this regard, the existence of the need for such improvements is not attributable to any failure of competition, but rather to the failure of individual airlines to provide better products and services. Specifically, it is a failure in the provision of sufficient onboard carry-on storage capacity and flexible carry-on policies that has had the attendant incidental effects of a decline in on-time perfor-

mance, the creation of safety risks with respect to carry-on bags, and increased passenger inconvenience and discomfort. That defendants' restriction may tend to eliminate or mitigate these effects is therefore not direct evidence that competition among carriers is enhanced by virtue of the restriction or, conversely, that competition itself would be retarded without the restriction; rather, it is merely evidence of the incidental effects on *individual* carriers of the elimination of competition among *all* carriers on the basis of carry-on baggage capacity and policies. Put differently, defendants' agreement does not promote competition itself, but rather only helps individual carriers in competition with other carriers by relieving them of the competitive pressure to offer better products and services with respect to carry-on baggage.[49] Yet, it cannot be accepted that the elimination of competition through product standardization—or, more precisely, the standardization of consumer expectations as to an element of airline service—is procompetitive because it makes more efficient competition on other elements of airline service.[50] To accept

process that the firms acting individually could not develop.'').

**49.** For example, while the record arguably contains some evidence that an excessive number of carry-on bags poses a safety risk to passengers and crew, such a risk exists only because the aircraft does not have adequate carry-on baggage storage capacity. Yet, there is no evidence in the record that individual airlines, in a competitive market, cannot provide sufficient storage capacity to meet passenger needs. Indeed, the FAA has rejected the imposition of a uniform carry-on bag size for all domestic carriers on the ground that ''safety is determined by the ability to stow every item properly, not by size or number alone.'' Carry–On Baggage Program, 52 Fed. Reg. 21,472, at 21,475. In this regard, the FAA recognized that ''[w]hile ... a single [carry-on baggage] standard has a certain appeal, a uniform standard for all air carriers and airplanes would necessarily have to be designed for the lowest common denominator (i.e., the smallest available stowage space, fleet-wide) and would therefore *drastically and needlessly limit carry-on baggage.*'' *Id.* at 21,473 (emphasis added). Thus, the record

discloses that defendants' agreement promotes onboard safety only insofar as it artificially restricts consumer demand for greater aircraft carry-on storage capacity and thereby alleviates any competitive pressure on airlines with inferior capacity to improve their services. There is otherwise no evidence that airlines cannot increase their carry-on storage capacity instead of interfering with the demand for this product. Similarly, there is no support in the record for the proposition that open competition in the market for air carriage service cannot produce the other results defendants seek to achieve through the elimination of competition—namely, improved on-time performance and increased passenger comfort and convenience. *See infra* note 52.

**50.** As discussed above, the output that airlines produce is composed of a various components, including nonquantitative, quality-based components. It is, therefore, no defense for defendants to claim that the elimination of competition on one aspect of output promotes competition insofar as it increases another aspect of output. *See* Phillip Areeda & Herbert Hovenkamp, Antitrust Law

this definition of competition-enhancement is to turn the fundamental premise of antitrust law on its head, for competitors cannot "pre-empt the working of the market by deciding for [themselves] that [their] customers do not need that which they demand." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 461–62, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Put differently, to sanction an elimination of competition where it has not been shown that unfettered competition in the market has failed is flatly inconsistent with the goals of the Sherman Act, which "was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," and was anchored to "the premise that the unre-

strained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." [51]

In conclusion, defendants' inability to offer any plausible or material procompetitive justifications for their agreement to restrict the size of carry-on baggage at Dulles resolves the question of whether an abbreviated inquiry into the reasonableness of the agreement under the Rule of Reason is enough to require the conclusion that the agreement is illegal. *Cf. CDA*, 526 U.S. at 778, 119 S.Ct. 1604.[52] Accord-

---

¶ 2023.1, p. 614 (Supp.2000) ("Ordinarily a naked horizontal restraint is not saved from per se condemnation simply because it offers the possibility of higher output of the narrowly defined product itself. The 'output' of any firm is the combination of the product plus other services that the market produces. Thus the output of a car dealer is car transactions, its desirable showroom hours of operation, and its advertising. An agreement among dealers not to have showrooms reduces costs and may or may not result in greater car sales. But we attach significance to the fact that consumers value the showroom; otherwise the competitive market would not have produced it.").

**51.** *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *see National Soc'y of Prof'l Eng'rs*, 435 U.S. at 695, 98 S.Ct. 1355 (noting that the Sherman Act "reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services.... The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers."); Herbert Hovenkamp, Antitrust Law ¶ 1902, p. 192 (1998) (arguing that open competition in the market not only reduces costs, but also encourages further innovation).

**52.** Even under a full Rule of Reason analysis, defendants' proffered justifications are likely to fail, as the record discloses that airlines at Dulles have less-restrictive or anticompetitive alternatives available to achieve the goals of

improved on-time performance, greater on-board safety, and increased passenger comfort and convenience. *See, e.g., Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991); *Kreuzer v. American Acad. of Periodontology*, 735 F.2d 1479, 1495 & 1496 n. 25 (D.C.Cir.1984); *North Am. Soccer League v. NFL*, 670 F.2d 1249, 1259, 1261 (2d Cir. 1982); *Rosebrough Monument Co. v. Memorial Park Cemetery Assoc.*, 666 F.2d 1130, 1145–46 (8th Cir.1981).

Even assuming *arguendo* that a restriction on carry-on bag size is an acceptable way to achieve these goals, it is indisputable that defendants can implement such a restriction at Dulles without imposing it on non-consenting carriers and thereby eliminating competition on carry-on baggage policies. Simply put, airlines wishing to restrict carry-on baggage size can install templates at their departure gates, where the restriction would impact only consenting airlines' passengers. Oversized bags screened there could then be checked at the gate or sent back to the main ticket counter.

Moreover, Continental has offered—and defendants have not disputed—evidence of other, less-restrictive alternatives to achieving these goals without necessarily restricting carry-on bag size for *all* carriers. For example, carriers could improve gate-checking procedures to facilitate smoother handling of carry-on bags too large to fit in aircraft storage bins. Or, airlines could station more personnel at gate areas to help customers with their bags. Still another option is to give passengers more time to board the aircraft and thereby to find storage space for their bags.

ingly, defendants' motion for summary judgment must be denied, and plaintiffs' motion for summary judgment must be granted, as to the legality of defendants' agreement under Section 1 of the Sherman Act.

## V.

■ Defendants argue that they are entitled to summary judgment because the record discloses that Continental has not suffered the requisite antitrust injury. The principles governing this contention are well-settled. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold damages by him sustained," in addition to costs and reasonable attorneys' fees. 15 U.S.C. § 15(a). In this regard, an antitrust plaintiff must show an injury to business or property "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful"—i.e., "antitrust injury." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Put differently, the plaintiff's injury must result from the reduction in competition caused by the defendant's illegal conduct. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343–44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). As the Fourth Circuit has stated, antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. The injury should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Lee–Moore Oil Co. v. Union Oil Co. of* Cal., 599 F.2d 1299, 1303 (4th Cir. 1979) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)).

■ Defendants argue that the carry-on baggage templates do not prevent plaintiffs from competing on the basis of carry-on bag size that can be carried to the gate. In this regard, defendants point to evidence in the record indicating that plaintiffs are able to allow passengers to bypass the templates by either: (i) distributing Medallions to its passengers, or (ii) stationing employees at baggage screening checkpoints to lift templates for Continental passengers. Given this, defendants argue, their agreement could not have caused plaintiffs *any* injury to business or property. This argument is unpersuasive.

Plaintiffs suffer injury to business or property despite the ability either (i) to distribute Medallions to passengers, or (ii) to station personnel at Dulles security checkpoints to lift the templates for Continental passengers. First, it is clear from the record that the Medallion program does not allow *all* Continental passengers to bypass the templates at Dulles security checkpoints.[53] Specifically, the undisputed evidence discloses that defendants intended to, and in fact did, limit the distribution of Medallions to high-revenue passengers—i.e., first class, business class, and

In this regard, defendants' argument that the configuration of Dulles *requires* that carry-on templates be installed at the common security checkpoints loses persuasive weight. In short, defendants' restriction, even if effective to secure defendants some benefits, does so by unnecessarily restricting competition and therefore cannot survive Section 1 scrutiny.

**53.** Defendants correctly conceded at oral argument that they have no legitimate interest in limiting the size of carry-on bags that Continental allows its customers. Despite this concession, defendants expressed unwillingness to distribute an unlimited number of Medallions to Continental and cited concerns over disrupting the effectiveness of the current templates with regard to other carriers' passengers. The necessary inference from this is that the Medallion program does not accommodate all Continental passengers. Were the record to reflect that all Continental passengers could avoid the carry-on baggage size restriction without significant cost to Continental, defendants' antitrust injury argument might well have force. The current record does not so indicate. Should defendants have evidence of this nature, however, they may seek reconsideration of the ruling.

"VIP" coach passengers—of carriers at Dulles. Thus, the Medallion program was not a means for dissenting carriers like Continental to allow all their passengers to avoid the templates; rather, the program is merely part and parcel of defendants' decision to standardize carry-on baggage policies at Dulles.[54] Because the Medallion program does not allow "low-yield" passengers to bypass the templates, defendants' agreement effectively eliminates competition among Dulles air carriers for this segment of the flying public on the basis of carry-on baggage policy. And, insofar as it is clear on this record that, absent defendants' restrictive agreement, Continental would have been able to attract low-yield passengers from other airlines—and thereby gain market share in this consumer group—Continental suffered injury to its business and property in the form of lost profits.[55] Because this injury "flows from that which makes defendants' acts unlawful"—namely, the elimination of competition on carry-on baggage capacity and policies—it is sufficient to show that plaintiffs have suffered "antitrust injury." *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690.

Nor is a different conclusion required by the fact that defendants have allowed Continental to station employees at Dulles security checkpoints to lift the templates for Continental passengers. In this regard, Continental has suffered damages, i.e., antitrust injury, in mitigating the competitive injury caused by defendants' restriction. *See Lee–Moore Oil Co.*, 599 F.2d at 1306 ("A plaintiff may recover for costs incurred in mitigating the anticompetitive effects of defendant's antitrust violation."). The fact that plaintiffs employed template-lifters at the Dulles baggage screening checkpoints in order to avoid the carry-on restriction qualifies as a "cost[ ] incurred in mitigating the anticompetitive effects of defendant's antitrust violation." *Id.* Plaintiffs have proved that the carry-on baggage restriction, absent mitigation by plaintiffs, would have prevented plaintiffs from attracting and winning customers and market share they otherwise would have won absent the restriction; this lost opportunity to reap competitive rewards is antitrust injury, and steps taken to minimize that injury constitutes recoverable mitigation.[56]

54. In this regard, the practical effect of the Medallion program is to impose on all carriers at Dulles a carry-on baggage policy similar to United's "Take–Off Fares" program at Des Moines International Airport, in that the Medallion program effectively reallocates onboard carry-on storage space that would otherwise be provided to low-yield passengers to high-yield passengers. But, unlike the "Take–Off Fares" program, the central defect of which was the significant prospect for United passengers to switch to other less-restrictive airlines, the Medallion program forecloses similar market-share losses by imposing the restriction on *all* carriers at Dulles, thus leaving low-yield passengers with no choice at Dulles but to bow to the restriction.

55. Thus, defendants' argument that Continental cannot prove antitrust injury stemming from the loss of potential customers because, as defendants rhetorically put it, "Why would a passenger switch airlines when the templates at Dulles apply equally to all carriers?" proves too much. It is precisely because passengers would not switch airlines at Dulles by virtue of the mandated standardization of carry-on baggage policies that plaintiffs have suf-

fered antitrust injury in the form of lost profits. It is the very fact that, in the words of Continental's expert, "the market is not allowed to reward Continental to the extent that its liberal on-plane baggage policy is a benefit to consumers," that Continental suffers injury to its business or property. PX 350 at 23.

56. Also unpersuasive is defendants' argument that plaintiffs have not offered proof of injury within the relevant geographic and product market. Given that the anticompetitive tendencies and effects of defendants' agreement are obvious and illegal under the Rule of Reason without examination of the relevant market, and that these effects were sustained by Continental at Dulles, no further examination of the relevant market is required to conclude that Continental has suffered antitrust injury.

In this regard, defendants' reliance on *Oksanen* and *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), is misplaced. In both cases, "there [was] no evidence that competition as a whole in the relevant market has been harmed"—that is, the predicate violation

Accordingly, Continental has proven that it has sustained antitrust injury sufficient to confer standing to bring its Clayton Act Section 4 claim. The amount of damages Continental has sustained, however, cannot be resolved on this record. A further hearing is required to determine whether defendants are entitled to summary judgment on damages, given the current record's lack of quantitative evidence on this point, or whether plaintiffs are entitled to make a further record on this issue.

■ Although defendants attack plaintiffs' Clayton Act § 4 claim on antitrust injury grounds, they essentially concede—as they must—that no similar attack on plaintiffs' Clayton Act § 16 claim for injunctive relief is appropriate. Section 16 authorizes preliminary and permanent injunctive relief in private litigation "against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26. Unlike Section 4 relief, Section 16 injunctive relief "requires a showing only of 'threatened' loss or damages" and does not require a showing of actual injury to business or property. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). As the Supreme Court put it, a plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

Thus, the requirements for injunctive relief under Section 16 are (i) a threatened loss or injury cognizable in equity (ii) proximately resulting from the alleged antitrust violation. Here, it is clear that defendants' agreement to restrict carry-on baggage size at Dulles is a violation of Section 1 of the Sherman Act. It is·also clear that the continued existence of defendants' agreement threatens Continental with injury to its ability to use its carry-on-baggage-friendly policies to attract customers and gain market share vis-a-vis other carriers at Dulles. Accordingly, summary judgment for defendants on antitrust injury grounds under Sections 4 and 16 of the Clayton Act must be denied.

## VI.

■ Defendants' final argument in defense of their agreement to restrain competition on the basis of carry-on baggage policies is that the restraint is immune from antitrust attack as a product of state action. In *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court laid the foundation for immunity from the antitrust laws for "state action or official action directed by a state." Under this "state action doctrine," an agreement is immune from antitrust liability if (i) the challenged restraint is "one clearly articulated and affirmatively expressed as state policy" and (ii) "the policy [is] ... 'actively supervised' by the state itself." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (citation and footnote omitted). Defendants must meet both requirements

of the Sherman Act had not been proven under the full Rule of Reason. *Oksanen*, 945 F.2d at 709; *see Hyde*, 466 U.S. at 31, 104 S.Ct. 1551 ("[T]here has been no showing that the market as a whole has been affected at all by the contract.") Accordingly, any injury sustained by the plaintiffs in those cases could not have flowed from injury to competition, and the plaintiffs, therefore, could not have suffered antitrust injury. *See Oksanen*, 945 F.2d at 707 ("[T]he fact that a

hospital's decision caused a disappointed physician to practice medicine elsewhere does not *of itself* constitute an antitrust injury."). Here, however, an abbreviated Rule of Reason inquiry—one that does not involve an examination of the relevant market—is sufficient to prove the predicate violation of the Sherman Act. As long as plaintiffs prove that their injury flows from this predicated violation, they have proven the requisite antitrust injury.

to prevail on the basis of the state-action doctrine.

The requirement that the challenged conduct must be undertaken "pursuant to a 'clearly articulated and affirmatively expressed state policy' to replace competition with regulation" serves to ensure that the state has authorized regulatory departures from free-market competition. *Hoover v. Ronwin*, 466 U.S. 558, 569, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). In this regard, however, the Supreme Court has made it clear that the state need not explicitly authorize conduct in order for that conduct to satisfy the first prong of the *Midcal* test:

> A private party acting pursuant to an anticompetitive regulatory program need not 'point to a specific, detailed legislative authorization' for its challenged conduct.... Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness.... [I]f the State's intent to establish an anticompetitive regulatory program is clear ... the State's failure to describe the implementation of its policy in detail will not subject the program to the restraints of the federal antitrust laws.

*Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 64–65, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). The task, therefore, is to determine, in the circumstances of each case, whether there is a clearly articulated, affirmatively expressed state policy to displace competition with regulation.

These principles compel the conclusion that defendants cannot meet *Midcal*'s requirement that the Dulles carry-on baggage size restriction was implemented in furtherance of a clearly articulated and firmly expressed state policy to eliminate airline competition on the basis of carry-on baggage policies. Even assuming *arguendo* that MWAA itself, and not defendants as mere private actors delegated authority by the MWAA, undertook the implementation of the carry-on baggage size restriction at Dulles, the regulation of competition among air carriers is neither a foreseeable result of, nor an intended regulatory program under, the Commonwealth of Virginia's and the District of Columbia's respective grants of authority to the MWAA.[57] The MWAA is a public body created as a result of a compact between the District of Columbia and Virginia and was granted "all necessary and convenient powers," including the power to "plan, establish, operate, develop, construct, enlarge, maintain, equip, operate,

---

**57.** The proper gauge of the extent to which the state action doctrine applies varies with the nature of the entity invoking the doctrine. The cases cited by defendants to support their claim that foreseeability is the appropriate standard involve political subdivisions such as cities, counties, municipalities, and townships—all subordinate governmental entities—invoking the state action doctrine for acts that the entities themselves took. In *Town of Hallie v. City of Eau Claire*, for example, the Supreme Court considered "how clearly a state policy must be articulated for a *municipality* to be able to establish that *its* anticompetitive activity constitutes state action." 471 U.S. 34, 40, 105 S.Ct. 1713, 85 L.Ed.2d 24 (emphasis added). At issue was a city's operation of the only local sewage treatment facility and refusal to provide service to nearby towns. *See id.* at 37, 105 S.Ct. 1713. The Supreme Court found it "clear that anticompetitive effects logically would result from [the city's] broad authority to regulate" the sewage facility and held the city's actions immune from antitrust attack. *Id.* at 42, 105 S.Ct. 1713. Similarly, in *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the state action doctrine shielded a municipality's anticompetitive restriction on the size of billboards despite the existence of only a broad grant of authority to regulate the use of land and the construction of buildings. On the other hand, *Midcal* and its progeny clearly establish that the governing standard for actions taken by private actors is whether "the State's intent to establish an anticompetitive regulatory program is clear." *Southern Motor Carriers*, 471 U.S. at 64, 105 S.Ct. 1721. Here, it is unnecessary to decide which of these standards apply, for the state-action doctrine is inapplicable under either standard.

and protect" Dulles. 1985 Va. Acts, ch. 598, § 5, as amended by 1987 Va. Acts 665; 1985 D.C. Law 6–67, § 6, as amended by 1987 D.C. Law. 7–18. It is clear that the MWAA's authority at Dulles properly extends only to the control and maintenance of the airport facilities at Dulles and not to the internal operating policies of the individual carriers or the services on which they compete. Indeed, an earlier ruling in this case dismissed plaintiffs' state-law claims on the ground that the Airline Deregulation Act preempts any state-law regulation of airline carry-on baggage policies. *See Continental I,* 120 F.Supp.2d at 570–73. It follows, therefore, that the MWAA has no more authority to promulgate a standardized carry-on baggage policy for all airlines at Dulles than it does to prescribe the price these carriers charge for airline tickets, the amount of legroom each carrier provides its passengers, or the quality of food each carrier serves. In sum, the state-action doctrine does not insulate defendants' agreement. Accordingly, defendants' motion for summary judgment should be denied on this ground.[58]

## VII.

In summary, defendants' agreement to restrict carry-on baggage size for all airlines at Dulles is a horizontal agreement to restrict output meriting an abbreviated Rule of Reason analysis. This analysis shifts the burden to defendants to offer plausible procompetitive justifications for the restraint. An examination of defendants' proffered justifications discloses that they do not enhance, and are otherwise not material to, competition. Accordingly, the restriction is an unreasonable restraint of trade that caused plaintiffs antitrust injury. While an injunction is appropriate under Clayton Act Section 16, a further hearing must be held under Clayton Act Section 4 on the question of damages.

An appropriate Order shall issue.

---

**58.** Because defendants have failed to satisfy this first prong of the *Midcal* test, it is unnecessary to discuss whether they have satisfied the second, "active supervision" prong.